UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case 25-CR-20021-DPG

United States of America
          Plaintiff

v.

Erick Ntekereze Prince
          Defendant

**DEFENDANT'S SENTENCING MEMORANDUM**

The Defendant, Erick Ntekereze Prince, through undersigned counsel, submits this memorandum in advance of sentencing and requests that this Court impose a sentence of 15 months' imprisonment, which is sufficient, but not greater than necessary, to satisfy the purposes of sentencing under 18 U.S.C. § 3553(a).

## I.      INTRODUCTION

Mr. Prince stands before the Court having accepted responsibility for his role in a serious fraud offense. He does not minimize his conduct. He understands that his actions, facilitating remote employment through deception, were wrong and warrant meaningful punishment. But this case should not be understood as one involving ideological alignment, espionage, or intentional harm to the national security of the United States. Rather, it is a fraud case involving a first-time offender who made money by acting as an intermediary in a scheme he should never have joined.

What distinguishes Mr. Prince is how he responded once confronted. At his change of plea, he took the unusual step of voluntarily requesting to be remanded into custody. He did not seek to delay accountability or maximize his liberty. Instead, he chose to begin serving his sentence immediately. That decision reflects a level of acceptance of responsibility and respect for the Court that goes beyond the typical case.

When the advisory guideline range is considered alongside Mr. Prince's actual conduct, his limited financial gain, his lack of criminal history, and his demonstrated acceptance of responsibility, a sentence of 15 months' imprisonment is sufficient, but not greater than necessary, to achieve the purposes of sentencing under 18 U.S.C. § 3553(a).

## II.     CLARIFICATIONS TO PRESENTENCE INVESTIGATION REPORT

Mr. Prince does not object to the advisory guideline calculations set forth in the Presentence Investigation Report (PSR), consistent with the plea agreement. However, he submits the following clarifications to ensure that the record accurately reflects his knowledge, intent, and role in the offense.

### A.  Nature of Offense Conduct

The PSR and the government's submission frame this case in terms of national security concerns tied to North Korea. While the broader scheme ultimately involved individuals affiliated with North Korea, the record is clear that Mr. Prince did not know that fact. As set forth in the factual proffer, he believed he was dealing with foreign nationals located in China who were not authorized to work in the United States—not agents of a sanctioned foreign government. *See* Factual Proffer, ECF No. 56 at 2.

This distinction is critical. Mr. Prince did not act with the intent to evade U.S. sanctions, to support a foreign adversary, or to implicate national security concerns. His conduct was motivated by financial gain and poor judgment, not geopolitical purpose. To the extent the PSR suggests otherwise, Mr. Prince requests that the Court consider this clarification.

### B.  Role in Offense

The PSR accurately describes Mr. Prince as a participant in the scheme, but certain language risks overstating his role. He did not create the false identities used in the scheme, recruit the overseas workers, or control the broader operation or distribution of proceeds. Rather, as reflected in the factual

proffer, he agreed to facilitate employment relationships through his company in exchange for a commission. *See id*. at 3. While his role was necessary, it was that of a facilitator. The Court should consider his conduct in that more limited context.

### C. Scope of Conduct

The PSR references that the conspiracy involved work performed for at least 64 U.S. companies and generated approximately $943,069 in proceeds. *See* PSR, ECF No. 82 ¶ 78. Mr. Prince does not dispute that those figures are properly considered under the Guidelines. However, those figures reflect the conduct of the broader conspiracy—not his individual gain or level of control. Mr. Prince's company received approximately $89,513. *See id*.; Factual Proffer at 4. This disparity is relevant to assessing his culpability under 18 U.S.C. § 3553(a).

### D. Acceptance of Responsibility

In addition to entering a timely guilty plea, Mr. Prince took the unusual step of voluntarily requesting to be remanded into custody at the time of his change of plea. There was no strategic benefit to this decision. He could have remained on bond pending sentencing. Instead, he chose to begin serving his sentence immediately. This conduct reflects a level of acceptance of responsibility and respect for the Court that goes beyond what is typically captured by the Guidelines and is relevant to the Court's consideration under 18 U.S.C. § 3553(a).

### III.   GUIDELINES OVERSTATE CULPABILITY

The advisory guideline range in this case is driven primarily by the loss amount, which results in a 14-level enhancement. The resulting range of 41 to 51 months, or 33 to 41 months with the agreed variance, significantly overstates Mr. Prince's personal culpability. The record reflects that the broader scheme generated nearly $950,000 in proceeds, while Mr. Prince received less than ten percent of that. *See id*.

This disparity matters. The Guidelines treat Mr. Prince as if he were responsible for the full scope of the scheme's proceeds, yet his actual role and benefit were far more limited. He did not design the scheme, did not create the false identities, and did not control the flow of funds. Instead, he received a percentage commission for facilitating employment relationships. *See* Factual Proffer at 3.

While the Guidelines provide a starting point, they are not the end of the analysis. *Gall v. United States*, 552 U.S. 38, 50 (2007). As the Supreme Court has made clear, a sentencing court "may not presume that the Guidelines range is reasonable" and must instead make an "individualized assessment based on the facts presented." *Id*. Here, the loss-driven enhancement substantially increases the advisory range based on conduct attributable to the broader conspiracy rather than Mr. Prince's individual gain or role. As a result, the guideline range exceeds what is necessary to achieve the purposes of sentencing under 18 U.S.C. § 3553(a). A variance is therefore warranted to ensure that the sentence imposed reflects who Mr. Prince actually is and what he actually did—not simply the aggregated conduct of others.

## IV.    NATURE AND CIRCUMSTANCES

### A.  Serious Conduct But Not a National Security Case

Mr. Prince acknowledges that his conduct was serious. He knowingly facilitated the employment of individuals who were not authorized to work in the United States and participated in deceptive practices to do so. At the same time, the nature of the offense should be understood in its proper context. As reflected in the record, Mr. Prince did not know that his co-conspirators were affiliated with North Korea. Rather, he believed he was dealing with foreign nationals located in China who were seeking work through improper means. *See* Factual Proffer at 2. That distinction matters. Mr. Prince did not act with the intent to evade U.S. sanctions, to support a foreign adversary,

or to implicate national security concerns. His motivation was financial. That does not excuse his conduct, but it places it in its proper context. This case is therefore best understood for what it is: a fraud case with international aspects—not a national security case in purpose or intent.

### B. Role Was Limited

Mr. Prince acted as a facilitator, not an architect. He did not create the false identities used in the scheme, recruit the overseas workers, control the overall operation, or receive the bulk of the proceeds. Instead, he hosted laptops, entered into contracts through his company, and received a commission for enabling the arrangement. *See* Factual Proffer at 3. While his role was necessary, it was also limited and replaceable. Others could have—and did—perform similar functions in comparable schemes. His conduct made the scheme easier, but it did not make him the driving force behind it.

Although the offense involved elements that the Guidelines classify as "sophisticated," those features were largely attributable to the structure of the broader scheme, including the use of false identities and overseas coordination. Mr. Prince's conduct, by contrast, was limited to facilitating employment arrangements through his company and hosting laptops within the United States. He did not design or control the more complex aspects of the scheme. This distinction is relevant to assessing his individual culpability under 18 U.S.C. § 3553(a).

### V.   HISTORY AND CHARACTERISTICS

Mr. Prince is a first-time offender who pursued higher education and maintained steady employment prior to this offense. His conduct since arrest is particularly significant. Most notably, he voluntarily requested to be remanded into custody at the time of his guilty plea. There was no strategic advantage in doing so. He could have remained on bond pending sentencing. Instead, he chose to begin serving his sentence immediately. That decision reflects genuine acceptance of responsibility,

respect for the Court, and a willingness to face consequences without delay. In assessing his character, the Court can look not only to what Mr. Prince has said, but to what he has done.

The letters submitted on Mr. Prince's behalf present a consistent picture—not of a person defined by this offense, but of a person whose life has been marked by service, integrity, and perseverance.

### A. Consistent Pattern of Service to Others

Multiple letters describe Mr. Prince's extensive volunteer work within his church and community. At the Genesee Park SDA Church Food Pantry, he contributed over 100 hours of service, assisting vulnerable individuals with food distribution and daily operations. *See* Letter from Sherrita Hope (Ex. A at 1). He is described as "a trusted presence" who treated others with dignity and compassion. *Id*. His pastor similarly describes him as "indispensable" to community outreach efforts and a positive role model within the congregation. *See* Letter from Pastor Moisés Espinosa (Ex. B at 1). This was not occasional volunteer work, but a consistent pattern of service.

### B. Demonstrated Integrity in Financial Dealings

The letters also describe Mr. Prince's conduct in personal financial matters. One long-time friend recounts loaning him approximately $13,000 during a failed business venture, which Mr. Prince repaid in full over time despite financial hardship. *See* Letter from Brian Park (Ex. C at 2). This conduct reflects accountability and a willingness to meet obligations even under difficult circumstances.

### C. A Life Marked by Hardship and Resilience

Mr. Prince's background is atypical. He was born into extreme hardship, with his family displaced by the Rwandan genocide and forced to live in refugee conditions before immigrating to the United States. *See* Letter from Ninteretse Jean Pierre (Ex. D at 1). Despite those circumstances,

he achieved higher education, supported his family, and built a life through work and persistence. Those who know him consistently describe a person committed to improving his circumstances and helping others. *See, e.g.*, Letter from Amy Le Gentil (Ex. E at 1). This history does not excuse his conduct, but it provides important context.

### D. Mental Health and Impact of Incarceration

Since this case began, Mr. Prince has been diagnosed with major depressive disorder, generalized anxiety disorder, post-traumatic stress disorder, and social phobia. *See* Letter from Sohamy Pinard (Ex. F). He has been compliant with treatment and has demonstrated improvement. *Id*. These conditions are relevant to sentencing, particularly where a lengthy term of incarceration risks exacerbating, rather than addressing, underlying issues that are already being treated.

### E. Extraordinary Acceptance of Responsibility

Mr. Prince's acceptance of responsibility is reflected not only in his guilty plea, but also in his conduct since arrest. As noted above, he voluntarily entered custody at the time of his plea and has consistently acknowledged his wrongdoing. This conduct reflects genuine acceptance—not strategic compliance.

### VI.    REQUESTED SENTENCE

A sentence of 15 months' imprisonment satisfies the purposes of sentencing under 18 U.S.C. § 3553(a). As the Supreme Court has made clear, this Court must impose a sentence based on an individualized assessment of the facts presented, rather than a mechanical application of the advisory Guidelines. *See Gall*, 552 U.S. at 50. Here, a 15-month sentence reflects the seriousness of the offense. For a first-time offender with no history of violence, a term of incarceration of this length constitutes a meaningful and consequential punishment.

A 15-month sentence provides adequate deterrence and promotes respect for the law. A felony conviction, a custodial sentence, and a term of supervised release together send a clear message, both to Mr. Prince and to others, that this conduct carries significant consequences. At the same time, such a sentence avoids imposing a punishment greater than necessary considering Mr. Prince's limited financial gain relative to the overall scheme, his non-leadership role, his lack of criminal history, his demonstrated record of service and rehabilitation, and his extraordinary acceptance of responsibility. While the advisory guideline range provides a starting point, it does not fully account for these individualized factors. A sentence of 15 months appropriately balances punishment with fairness and satisfies the parsimony principle embodied in § 3553(a).

The government's sentencing memorandum cites several cases involving similar schemes to facilitate remote information technology work by foreign nationals. Those cases confirm that courts take this type of conduct seriously. They also demonstrate, however, that sentencing outcomes turn on the defendant's individual role, knowledge, and scope of participation. For example, in *United States v. Chapman*, No. 25-CR-220 (D.D.C.), the defendant facilitated fraud on a far larger scale (approximately 300 companies and millions of dollars in proceeds) and the court emphasized the defendant's awareness that she was assisting an "enemy of the United States." *See* Gov't Sent'g Mem., ECF No. 81 at 15. Similarly, in *United States v. Vong*, No. 24-CR-177-DLB (D. Md.), the defendant participated in a multi-year scheme involving approximately $977,000 in proceeds and the transmission of a substantial portion of those funds to overseas co-conspirators. *See* Gov't Sent'g Mem. in *Vong* (Ex. G at 1). The government sought a sentence of 30 months' imprisonment. *Id*. The court ultimately imposed a sentence of 15 months' imprisonment. *See* Press Release, U.S. Dep't of Justice, *Maryland Man Sentenced for Conspiracy to Commit Wire Fraud* (Dec. 4, 2025) (Ex. H).

Mr. Prince's circumstances are materially different. He lacked any knowledge of a North Korea connection, did not operate on the scale seen in *Chapman*, and his company received approximately $89,000—far less than the proceeds in *Vong*. Nor did he transmit the bulk of proceeds overseas or facilitate access to sensitive government systems. These distinctions support a substantially lower sentence under 18 U.S.C. § 3553(a).

## VII.   ALTERNATIVE VARIANCE

If the Court determines that a sentence of 15 months is not appropriate, the same § 3553(a) considerations support a meaningful downward variance from the advisory guideline range. In particular, Mr. Prince's limited role, lack of knowledge of any national security implications, minimal financial gain, and demonstrated acceptance of responsibility support a sentence well below the advisory range.

## VIII.   CONCLUSION

Mr. Prince stands before the Court as a first-time offender who made a serious mistake and has taken meaningful steps to accept responsibility and begin rehabilitation. For the reasons set forth above, he requests that the Court impose a sentence of 15 months' imprisonment, or, in the alternative, a meaningful downward variance sufficient, but not greater than necessary, to satisfy the purposes of sentencing under 18 U.S.C. § 3553(a).

Respectfully submitted,

/s/ Christopher M. DeCoste
FL Bar: 15969
Law Office of Christopher DeCoste, P.A.
40 NW 3rd St PH 1, Miami, FL 33128
cmd@christopherdecoste.com
305-395-5775

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed through CM/ECF on May 4, 2026 and served on all appropriate parties through that system.

/s/ Christopher M. DeCoste
Law Office of Christopher DeCoste, P.A.

# Ex. A

**To Whom It May Concern,**

I am writing on behalf of the Genesee Park SDA Church Food Pantry to offer a sentencing recommendation for Eric Ntekereze, who served as a dedicated volunteer with our organization from July through October. During his time with us, Eric contributed over 100 hours of service, and his impact on our team and the broader community has been both meaningful and lasting.

Eric quickly became an integral part of our volunteer staff. His caring nature, dependability, and attention to detail made him a standout contributor. Whether organizing food donations, assisting clients, or helping maintain our pantry's operations, Eric approached every task with professionalism and compassion. His ability to connect with individuals from all walks of life and his consistent reliability made him a trusted presence in our daily work.

Beyond his technical contributions, Eric's presence brought warmth and stability to our team. He showed genuine concern for the well-being of others and often went above and beyond to ensure that our clients felt respected and supported. His absence is deeply felt—not only by our staff but by the many families who benefited from his kindness and commitment.

We respectfully ask that Eric's service to the community be taken into consideration during sentencing. His time with us reflects a person capable of empathy, responsibility, and meaningful contribution. We believe in his potential to continue making a positive impact and hope that his demonstrated character and dedication will be weighed accordingly.

Sincerely,

Sherrita Hope

Pantry Coordinator

Genesee Park SDA Food Pantry

212-203-9410 / ritarenee77@gmail.com

Ex. B

Pastor Moisés Espinosa
Seventh-day Adventist Genesee Church

391 Genesee Park Blvd,
Rochester, NY 14619
espinosamoses39@gmail.com
Date: 12/1/2025

The Honorable Judge Darrin P. Gayles
United States District Court

Dear Judge Gayles,

I am writing on behalf of Mr. Erick Ntekereze Prince, whom I have known for over two years as his pastor at the Seventh-day Adventist Church in Rochester, New York. It is both an honor and a responsibility to offer this character reference for him.

He volunteered regularly at the Genesee Church Food Pantry, assisting with food distribution and sorting clothing for families in need. His reliability, patience, and willingness to serve others made him an indispensable part of our outreach efforts. Erick also participated in various community service activities the church organized, always showing humility and a sincere desire to uplift others.

Erick attended church faithfully, showing commitment to his spiritual growth, personal development, and moral values. His conduct within the congregation consistently reflected integrity, respect, and kindness. Through his involvement, he became a positive role model for younger members and a cherished friend to many.

Our church community, his friends, brothers, and sisters in faith, will greatly miss his warmth, positive attitude, and genuine spirit of service. Erick's character has always been one of encouragement and goodwill, and his absence is deeply felt among those who have come to know and appreciate him.

Thank you for taking this testimony into consideration. If you require any additional information, please feel free to contact me directly.

Respectfully,

_____

Pastor Moisés Espinosa
Seventh-day Adventist Genesee Church
Rochester, New York

Ex. C

Brian PARK
+1 (248) 880-7214
6201 Shimmer Falls dr
Roseville, CA 95747
bpark37@gmail.com
Brian@bpsmerchant.com

Honorable Judge Darrin P. Gayles
Wilkie D. Ferguson, Jr. United States Courthouse
400 North Miami Avenue
Room 11-1
Miami, Florida 33128

Letter in Support of Eric Ntekereze's Sentencing

Dear Judge Darrin P. Gayles,

I am writing this letter on behalf of my dear friend, Eric, whom I have had the privilege of knowing for over

eleven years. He has been a close and consistent presence in my life, someone I have always made an

effort to stay in touch with.

I first met Eric in the summer of 2014 while doing church mission work in Michigan. He was fresh out of

Christian academy, and I was a senior at Michigan State University. We were part of a group selling

Christian books door to door — a challenging yet deeply rewarding experience that forged a strong bond

between us. Though we were both young and still maturing at the time, I have since had the honor of

watching him grow into the thoughtful and responsible man he is today.

Shortly after that summer, I had the privilege of living with Eric in New Jersey while completing an

internship. It was a joy sharing that time with him and exploring life in a new place together. I witnessed

firsthand how hard he worked to support himself, pay for school, and develop his business ideas. He

would take a bus into the city for his job at a small sandwich and soup shop, and in his free time, he

would diligently work on his startups. His intelligence, creativity, and work ethic have always impressed

me. Above all, Eric has consistently demonstrated honesty and reliability — qualities that have defined his

character throughout the years.

One example that stands out clearly in my memory speaks to his integrity and determination. While I was

serving as a student missionary in Southeast Asia, Eric reached out to me about a business venture he

was pursuing. He needed funding and asked if I would be willing to loan him approximately $13,000. He

expressed his conviction in the project, assured me he would repay the amount as soon as he secured

investors, and even drafted formal contracts to make our agreement official. Trusting his character and

abilities, I agreed to help him.

Unfortunately, his efforts to obtain funding were unsuccessful, and though I never doubted his intentions, I

did begin to worry that repayment might not be possible. However, over the years that followed, Eric

consistently sent me payments whenever he could — $1,000 here, $1,500 there — even taking on extra

jobs, including one as a dishwasher, to make sure he honored his word. In the end, he repaid every

penny, plus additional funds as a gesture of gratitude. I was never the one to pressure him; he repaid me

entirely of his own accord. I found this remarkable, as it is rare to see such integrity and perseverance,

especially in financial matters among friends.

Through all the years I have known him, Eric has remained a loyal friend guided by his faith in God. I

have seen how that faith has shaped his character and helped him navigate life's challenges. He is

someone I deeply respect and am proud to call a friend.

When I learned about this case and the allegations against him, I was shocked. From everything I know of

Eric — his moral compass, his diligence, and his honesty — I cannot imagine him knowingly participating

in any fraudulent activity. I believe he became entangled with the wrong people and was misled, rather

than acting with malicious intent.I understand that my words may carry only limited weight in this matter, but I respectfully ask that you

consider my experiences with Eric and the strong character he has demonstrated over more than a

decade of friendship. I truly believe he is a good man who has simply found himself in an unfortunate

situation. Should the court decide against acquittal, I sincerely ask for leniency in his sentencing.

Eric is a devoted friend, brother, and son, and his absence would be deeply felt by all who know him. I

look forward to the day I can see him again and witness him continue to grow into the man I know he

strives to be.

Thank you for taking the time to read my letter and for considering my perspective. I wish you wisdom and

peace as you make your decision.

Sincerely,

Brian Park

Ex. D

Ninteretse Jean Pierre
Rochester, New York
Jeanpierren41@gmail.com

Honorable Judge Darrin P. Gayles
Wilkie D. Ferguson, Jr. United States Courthouse
400 North Miami Avenue
Room 11-1
Miami, Florida 33128

**Letter in Support of Eric Ntekereze's Sentencing**

Dear Honorable Judge Darrin P. Gayles:

I write in support of my cousin, Eric Ntekereze, with a sincere request that the Court consider the full measure of his life and character, and impose a sentence that is just, equitable, and allows him to begin redemption soon.

I have known Eric since he was born and I can attest that Eric has always been an upstanding, caring, loving and all in all a really good guy, whom I am lucky to call a cousin. I can confidently say that Eric is really loved by all cousins (and there are at least 20 of us), aunties, uncles, and every family member. Eric is funny, quick-witted, generous, caring, and God-fearing; he also makes a mean turkey on Thanksgiving (a skill that has endeared him among our family of immigrants that usually relies on typical African food for Thanksgiving). Eric is one who remembers birthdays without being reminded, who shows up early to help set the table, who stays late to wash the last dish, and who remembers to make restaurant reservations when no one wants to take on that task. It is no exaggeration to say he is the favorite among us. It is simply the truth of how he makes people feel seen and cared for.

Eric has been there for me personally at every turning point—when I got married, when I became a parent, and in the quiet moments in between when I needed a steady hand more than I knew how to ask. I would like to believe I am special to him, but the truth is that Eric treats everyone this way. His generosity knows no bounds. He is the person who answers the late-night call, who shows up with soup when you are sick, and who helps carry the heavy boxes without being asked. He is reliable in the ways that matter most.

What makes this all the more remarkable is where he started. Eric was born in a refugee camp in Tanzania after his parents fled the civil war in Rwanda. He lived there for years before arriving in Rochester barely a teenager. The challenges of integration—from language and culture to sheer survival—are hard to capture on paper. Even so, he pressed forward. He graduated from high school, completed college, and took on every job he could find. He did not ask for shortcuts; he learned, he worked, and he kept moving.

I understand how complex our legal system can be, especially for someone who did not grow up within it and has no legal training. I also know Eric has not used that complexity as an excuse. He has accepted responsibility for his conduct. He has expressed deep regret, not in grand declarations, but in the humble way he has always acknowledged when he has fallen short and resolved to do better.

Ninteretse Jean Pierre
Rochester, New York
Jeanpierren41@gmail.com

I wish we were not here. We all do. Yet I know Eric will treat this moment as a turning point and not a dead end. He is remorseful. He is capable of growth. He has a strong and loving family ready to hold him accountable and to support him as he rebuilds. I believe—based on a lifetime of watching his persistence and heart—that he will emerge from this stronger, steadier, and fully committed to being the law-abiding, contributing family member he has always tried to be.

With respect for the seriousness of these proceedings, I ask that the Court impose a sentence that recognizes both the harm and the human being before you—a sentence that holds him accountable while preserving his ability to return to his community and begin his redemption. Eric has overcome long odds before. With the chance to do so, he will do it again, and he will make good on it, and I know he will make us all proud.

Thank you for your consideration.

Respectfully,

Ninteretse Jean Pierre

# Ex. E

**Amy LE GENTIL**
**16 rue Ginette Neveu**
**Paris, 75018**
**FRANCE**
**amylegentil@gmail.com**
**+33 7 86 23 90 84**

**November 19, 2025**

**The Honorable Judge Darrin P. Gayles**
**Wilkie D. Ferguson, Jr. United States Courthouse**
**400 North Miami Avenue**
**Room 11-1**
**Miami, Florida 33128**

**Re: Character Reference for Eric Ntekereze Prince**

Dear Judge Gayles,

My name is Amy Le Gentil, and I have been Eric's partner for a year. He is the first man I have ever loved, and I waited almost my entire life to meet someone with his heart. I had never experienced the level of care, tenderness and emotional support he has shown me. Eric has always supported me, helped me navigate family difficulties and offered the same devotion to anyone he loves, especially his parents.

We met in Paris on the night of July 12, 2024, and we officially became a couple on December 12 of that same year. From the very first day, his character stood out. His honesty struck me immediately. He hid nothing about his past, his childhood or the difficult circumstances of his upbringing. He has always been resilient, hardworking and deeply faithful. He never shied away from his humble beginnings and how hard he worked to build a more stable life for himself and his parents. His devotion to his family is something rare. Many people run from the pain of their childhoods, yet Eric carries no bitterness. He believes his parents did the best they could with the little they had, and he honors them for it.

I was made aware of this case from the first moment. It was deeply traumatic for me. We were returning from a wonderful vacation together, and I was waiting for him to land safely. I spent hours checking his location until I learned he had been arrested. I cried more that week than I ever had in my life. Even after learning what he was being accused of, I chose to stay by his side because I knew the man he truly is. I come from Paris, the so-called city of love, yet no one in my life, not even my own father or my closest friends, has ever been as loving, protective and respectful of me as Eric. I often criticize men because many can be careless or unkind, but Eric proved to me that there are still men with genuine faith, integrity, loyalty and compassion. He is the man who brought me closer to God. Even though we do not share the same religion, he always reminded me to praise God in every circumstance.

Eric has always been respectful toward my friends, even those whose style, identity or mindset are unconventional. While others might judge them, he welcomed them with kindness. I did not know him at the time of the events in this case, but when he told me

everything, I made the decision to trust him. I am not someone who falls blindly in love. If I had been, I would have many stories to tell. But with Eric, I knew he never meant to harm anyone. Sometimes opportunities seem safe until they reveal their dangers. Many people have fallen for similar schemes. For many couples, this situation would have destroyed everything, but we chose to stay together and face it.

I say this with humility: there are many men in the world, and I am not someone who struggles to attract people. I work as a model; meeting men has never been an issue. But when you find true love, devotion and loyalty in a man who respects your values, your family and your friends, you hold on to it. That is why I choose Eric every single day. I have never met a man like him. He considers everyone around him before himself. He is thoughtful to a level that surprises me daily, such as avoiding strong perfume because his lawyer was pregnant and might be sensitive to smells. Even I would not have thought that far.

What touched me most about him at the beginning was his calm voice, his warmth and his kindness. I fell in love with his tired, sad eyes, because I could see how much life he had endured. Later, I learned more about the unimaginable experiences he lived through as a child. Rwanda's genocide was one of the most horrific events in modern times. Eric grew up in fear, in poverty, between a jungle and a farm. He lived through moments no child on earth should face. He had to dig holes to hide with his family at night so they would not be killed or kidnapped. His parents often starved so their children could eat. He worked from a young age to bring food home. He did not win the geographic lottery, but God helped him and his family leave that nightmare.

He has carried physical and emotional scars from this past. His trauma affected his development so deeply that his adult teeth never grew properly, and he had to fix them in his late twenties. Despite everything, he never became angry at the world. He studied relentlessly, always achieving high grades because he knew education was his only path to a better future. As a Black refugee child in predominantly white schools, he was mocked and discriminated against for his accent and identity, yet he remained kind and determined.

Even during the most stressful period of his life with this case, he stayed a devoted son and a caring partner. He supported me through my own struggles, checked on me constantly and helped me fight depression while he was drowning in his own. After returning to his parents' home, he found work as a delivery driver, despite the weight of this case hanging over him. He often worked fifteen hours a day, sometimes more. He cared for his ill father, brought food home, helped with medical appointments and supported his parents financially. He also volunteered at charities for several hours each week. I witnessed his exhaustion, but he never complained. He simply kept going and focused on helping others.

Loving someone from far away during such a painful moment is incredibly hard. I could not help him legally, but I could be present emotionally. It broke him to realize the financial burden this case represented. Neither of us comes from wealth, and the cost of legal defense in the United States is beyond what we could ever imagine. His parents must have felt powerless, which is heartbreaking for any parent. Anyone who loves Eric has felt that pain.

He is not gone forever, but his absence feels like stolen time. I miss him deeply. It hurts not to be able to reach him whenever I need to hear his voice. It scares me to know he is in such a dark environment. He witnessed suicides inside the facility, events that can shake anyone's spirit. I pray for him constantly and hope he can return to me soon.

I know Eric wants to become a better man, and this experience has already changed him. He will be more cautious, more disciplined and more aware of the law. His devotion to God, his family, his community and to our future together is stronger than ever.

Eric has always been mature because life forced him to grow up quickly. He worked hard to educate himself, to rise above his circumstances and to build a better life for his parents and himself. In America, many people dream of becoming wealthy and successful, but the truth is that the "lottery of life" is not equal for everyone. When one is not born with the right advantages, ambition can sometimes lead to missteps. Eric dreamed of becoming a CEO in the tech world, without knowing the legal, structural and financial complexities behind such a journey. This case traumatized him deeply. He no longer wants to pursue entrepreneurship, and I worry about how his future opportunities will be affected. A conviction can follow someone for life, especially a Black man. But he has accepted responsibility for his actions, and he is ready to face the consequences.

I am grateful to be able to write this letter. At the plea hearing, I could not speak, but I had so much to express. I am appreciative that you allowed us to share one last meal before he was taken into custody. It was heartbreaking to see him escorted away, yet it was an experience I will never forget.

Thank you, Judge Gayles, for allowing me to share my thoughts and feelings about Eric. I hope these words offer a true glimpse into the kind and extraordinary person he is. Thank you for your time and consideration.

Respectfully,

**Amy Le Gentil**

Ex. F

# REVIVED SOUL MEDICAL  rsmedical

### 1329 EAST 17TH STREET
### BROOKLYN, NY 11230
#### TEL: 718-382-5060
#### FAX: 718-382-590510/23/2025

Dear Judge Darrin P. Gayles

I am writing this letter in support of my patient, Eric Prince who has been under my care since March 17th 2025. During this time, he has been diagnosed with Major Depressive Disorder, Generalized Anxiety Disorder, Post-Traumatic Disorder and Social Phobia.Despite the challenges associated with these conditions, Mr. Prince has demonstrated a strong commitment to treatment and personal growth.

He has been fully compliant with prescribed medication and treatment plan, which includes both medication management and therapeutic interventions. Mr. Prince consistently attends scheduled appointments, adheres to prescribed medications, and actively participates in discussions regarding his progress and wellness goals.

In my professional observation, Mr. Prince has shown improvement in emotional stability and overall functioning. He has been open, cooperative, and willing to work collaboratively on treatment goals. During all interactions, he presents as well-adjusted, respectful, and demonstrates insight into his mental health. There are no observable behavioral issues or concerns while under my care.

It is my professional opinion that Mr. Prince exhibits good character, accountability, and genuine motivation to maintain a healthy lifestyle. He continues to make steady progress toward recovery and personal wellness.

Please feel free to contact me if you require any additional information or clarification regarding Mr. Prince's treatment and progress.

Sincerely,

Sehamy Pinard

# Ex. G

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| v. | * | |
| | * | **CRIMINAL NO. DLB-24-177** |
| MINH PHUONG NGOC VONG, | * | |
| | * | |
| Defendant. | * | |
| | * | |

**\*\*\*\*\*\*\***

**<u>GOVERNMENT'S SENTENCING MEMORANDUM</u>**

The Defendant, Minh Vong, pleaded guilty to a single-count indictment charging him with wire fraud conspiracy, in violation of 18 U.S.C. § 1349. Over a roughly four-year period, Mr. Vong conspired with information technology (IT) workers living in China to defraud at least thirteen U.S. companies and four U.S. government agencies into hiring Mr. Vong as a remote IT worker by lying about his credentials. In reality, Mr. Vong operated a "laptop farm," that is, he installed remote access software on employer laptops—and shipped some employer laptops directly to China—to enable his overseas co-conspirators to perform the IT work. There is strong evidence that Mr. Vong's co-conspirators were, in fact, working for the North Korean government. As a result of the fraudulent scheme, Mr. Vong received close to $1 million in salary payments for IT work that he did not perform. More troublingly, Mr. Vong transmitted roughly 70-80% of the money earned to his North Korean co-conspirators and granted them access to sensitive government systems.

The government respectfully submits that a sentence of 30 months in the Bureau of Prisons, followed by 3 years of supervised release, is the sentence that best reflects the seriousness of the offense, affords adequate deterrence, protects the public, and avoids unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a).

## RELEVANT FACTS

### Background on the North Korean IT Worker Scheme

Since 2003, the Democratic Republic of Korea (North Korea) has been under sanction by the United Nations (U.N.), due to its testing and expansion of its nuclear weapons program. Since 2016, the United States has implemented comprehensive sanctions against North Korea due to the national security threats it poses, including through its nuclear weapons program. These sanctions have had the effect of cutting off North Korea from the U.S. financial system and limiting the ability of U.S. persons and companies to do business with North Korea. In recent years, North Korea's leader, Kim Jong Un, has called the United States his country's "biggest enemy" and has vowed to continue expanding North Korea's nuclear weapons program.[1]

North Korea has sponsored various subterfuge schemes to evade U.N. and U.S. sanctions to earn money for the regime and for its weapons programs. One such scheme involves the use of thousands of highly skilled IT workers to fraudulently obtain remote employment with companies around the world, including the U.S., using false, stolen, or borrowed identities. In order to circumvent controls put in place by U.S. companies to prevent the hiring of illicit overseas IT workers, the North Korean IT workers obtain assistance from persons residing in the United States.[2]

### Offense Conduct

Pursuant to his plea agreement, Mr. Vong stipulated to the following statement of facts:

> Beginning at least in or about September 2020 and continuing until in or about May 2024, the defendant, Minh Phuong Ngoc **VONG**, a naturalized U.S. citizen living in Bowie, Maryland, conspired with John Doe, a/k/a "William James," a foreign national

---

[1] *See, e.g.*, Kim Jong-un calls US 'biggest enemy' and says nuclear submarine plans 'complete,' *The Guardian*, Jan. 8, 2021, *available at* https://www.theguardian.com/world/2021/jan/09/kim-jong-un-calls-us-biggest-enemy-and-says-nuclear-submarine-plans-complete (last visited Nov. 21, 2025).

[2] *See* Public Service Announcement, "North Korean IT Worker Threats to U.S. Businesses," *Federal Bureau of Investigation*, Jul. 23, 2025, *available at* https://www.ic3.gov/PSA/2025/PSA250723-4 (last visited Nov. 24, 2025).

living in Shenyang, China, and one or more others, to defraud various U.S. companies into hiring **VONG** as a remote software developer through materially false representations about **VONG's** education, training, and work experience.  Thereafter, Doe, posing as **VONG**, used **VONG's** computer access credentials to perform the software development work, thereby causing the U.S. companies to transmit salary payments via interstate wire communications to **VONG**, portions of which **VONG** caused to be transmitted by wire communications to overseas bank accounts for Doe and other conspirators.  **VONG** installed remote access software on his computers to facilitate Doe's access to them, which also helped conceal Doe's location in China.

For instance, on January 30, 2023, Doe caused a fraudulent resumé in **VONG's** name to be submitted to Virginia-based technology company ("U.S. Company 1") for the position of web application developer, a position which required that the applicant be a U.S. citizen.  The resumé falsely represented that **VONG** had earned a Bachelor of Science degree from the University of Hawaii and had 16 years of experience in the field of software development.  On March 28, 2023, **VONG** participated in an online video job interview with the Chief Executive Officer of U.S. Company 1 in which **VONG** verified his identity and citizenship by holding up to the screen his Maryland driver's license and U.S. passport.  U.S. Company 1 used this information to complete an I-9 form for **VONG** verifying his citizenship and eligibility for employment.

Following the video interview, U.S. Company 1 officially hired **VONG** as a software developer and assigned him to work on a contract for the Federal Aviation Administration (FAA) involving a particular software application.  This software application was used by various U.S. government agencies to manage sensitive information regarding national defense matters.  U.S. Company 1 shipped **VONG** a Macbook Pro laptop that he was to use in connection with his employment, and the FAA authorized him to receive a Personal Identity Verification ("PIV") card to access government facilities and systems. Between March 2023 and July 2023, Doe, while in China, used **VONG's** computer access credentials to perform the software development work and participate in online meetings with U.S. Company 1 and FAA representatives, all the while pretending to be **VONG**.

Doe and **VONG** communicated via an online messaging platform about the remote software developer job at U.S. Company 1, the steps **VONG** needed to take in order to get hired for the position, and various matters that arose during the time that **VONG** was pretending to perform—and Doe was actually performing—the job at U.S. Company 1. For instance, on March 24, 2023, **VONG** and Doe (using the moniker "William James") engaged in the following conversation over the online messaging platform:

> Doe:  btw bro, i need you to go and get piv card again… new job
>
> . . .
>
> **VONG**:  I [sic] for FAa piv card?
>
> Doe:  yes

3

>**VONG**:     What company is our joba [sic]

>Doe:     [U.S. Company 1]

As a result of **VONG's** fraudulent misrepresentations, U.S. Company 1 transmitted more than $28,000 in gross wages to **VONG** via interstate wire communications for work that **VONG** never performed.  **VONG** knowingly caused portions of this money to be transmitted via wire communications to overseas bank accounts for Doe and other conspirators.

<u>May 13, 2024 Search Warrant & Interview</u>

On May 13, 2024, FBI agents executed a search warrant at **VONG's** residence in Bowie, Maryland.  From the residence, the agents recovered the following items, among others:

i.     silver Apple Macbook Pro laptop, serial number GQDHQXP6TF;
ii.     black Dell laptop, model Latitude E7740;
iii.     iPhone 14 Pro Max, serial number CD6D7VXJYR;
iv.     gray laptop, model ANL5, serial number GD5095P23AJ927042;
v.     silver HP laptop, serial number 5CD236C9J5;
vi.     Lenova laptop, serial number R90ZDFCA;
vii.     two Canadian coins worth 200.00 Canadian dollars;
viii.     $13,715.00 in U.S. currency;
ix.     iPhone 11 Pro Max, serial number FK1ZL2Y7N70P with blue case;
x.     iPhone 15 Pro Max serial number FGX4XLQJ6M with black case; and
xi.     iPhone 14 Pro, serial number FGHGC6CZPH.

**VONG** agreed to a voluntary interview with FBI agents.  During the interview, **VONG** admitted that he met Doe via an online gaming platform and agreed to participate in the scheme to defraud U.S. companies by posing as a software developer and granting Doe his computer access credentials.  **VONG** admitted that, in reality, he had no college degree or background in software development and did not perform any of the software development work for the U.S. companies with which he was employed.  Instead, **VONG** allowed Doe to use **VONG's** computer access credentials in order to remotely perform software development work for the U.S. companies and U.S. government entities.  **VONG** also mailed laptops to Doe in China on two occasions.  **VONG** acknowledged that he knew Doe was not a U.S. citizen and was not eligible to perform the software development work for the U.S. companies or U.S. government entities.  **VONG** stated that he kept between 20% and 30% of the wages earned through the scheme and transmitted the remainder to bank accounts controlled by Doe and/or other conspirators.

Victims

Between 2021 and 2024, **VONG** used fraudulent misrepresentations to obtain employment with at least 13 different United States companies, who collectively paid **VONG** a total of more than $970,000 in salary for software development services that were, unbeknownst to them, performed by Doe and/or other overseas conspirators. The chart below shows the salaries paid to **VONG** by some of the defrauded companies during his period of employment with them:

| Defrauded Company | Period of Employment | Salary Paid |
|---|---|---|
| U.S. Company 1 | 03/28/2023 – 07/14/2023 | $28,324.33 |
| U.S. Company 2 | 09/28/2023 – 03/28/2024 | $44,292.36 |
| U.S. Company 3 | 07/10/2023 – 07/19/2023 | $4,829.55 |
| U.S. Company 4 | 10/25/2021 – 03/31/2023 | $156,203.79 |
| U.S. Company 5 | 05/08/2023 – 12/29/2023 | $67,200.00 |
| U.S. Company 6 | 10/31/2022 – 05/21/2024 | $170,715.34 |
| U.S. Company 7 | 11/12/2020 – 01/04/2022 | $99,701.29 |
| U.S. Company 8 | 03/06/2023 – 05/24/2023 | $28,086.12 |
| U.S. Company 9 | 01/17/2022 – 01/05/2023 | $158,752.81 |
| U.S. Company 10 | 05/22/2023 – 09/29/2023 | $43,801.43 |
| U.S. Company 11 | 04/04/2022 – 06/23/2022 | $29,545.13 |
| U.S. Company 12 | 02/20/2023 – 05/19/2023 | $44,588.25 |
| U.S. Company 13 | 09/04/2022 - 04/01/2023 | $63,846.41 |
| U.S. Company 14 | 08/08/2022 – 03/22/2023 | $37,651.52 |
| **TOTAL** | | **$977,538.33** |

Throughout the relevant time period, **VONG** worked as a nail technician at [a nail spa] in Bowie, Maryland, earning roughly $20 per hour. According to Maryland wage records, during the first three quarters of 2021, **VONG** received wages exclusively from Allure Nail Spa, earning less than $30,000. However, beginning in the fourth quarter of 2021 and continuing through the third quarter of 2023, **VONG** received wages from multiple other U.S. companies, and the amount of his wages increased roughly ten-fold. The chart below shows **VONG's** wage records by year and employer source:

### Wage records by Year and Employer Source

| Year | Allure Nail Spa | % of Total | Other Employers | % of Total | Total |
|---|---|---|---|---|---|
| 2021 | $ 29,921 | 67% | $ 14,815 | 33% | $ 44,736 |
| 2022 | $ 38,898 | 9% | $ 388,401 | 91% | $ 427,299 |
| 2023 | $ 28,827 | 6% | $ 439,132 | 94% | $ 467,959 |
| 2024 | $ 6,465 | 9% | $ 66,813 | 91% | $ 73,278 |
| | $ 104,111 | 10% | $ 909,161 | 90% | $ 1,013,272 |

*The year 2024 only includes wage record data up to Q4

Several of the defrauded companies contracted out **VONG's** services to United States government agencies, including the [Department of Transportation's] FAA, the [Department of Commerce's] Census Bureau, the Department of Agriculture, and the Department of the Interior.  As a result of **VONG's** fraudulent misrepresentations, these government agencies unknowingly granted access to sensitive government systems to Doe and other overseas conspirators, who accessed those systems from IP addresses in China.

ECF 29 (Plea Agreement), Attachment A.

Although Mr. Vong's overseas co-conspirator was living in China during the relevant time frame, there is strong evidence that he was, in fact, working for North Korea.  For instance, on May 10, 2023, in a Skype chat with an unknown individual, Doe stated: "latest news as our foreign ministar [sic] and Chinese ambassador met."  Based on open-source research, on May 9, 2023, Kyodo News, a Japanese news agency, published an article with the headline "North Korean foreign minister meets, goes fishing with new China envoy."

Furthermore, Doe's Skype chats contain multiple references by Doe to making visits to "PY," which is commonly used as a reference to Pyongyang.  And on June 15, 2022, there was a discussion between Doe and an unknown individual about visiting a specific mountain and ski resort located in North Korea.

In addition, in a Skype chat on August 20, 2022, the same unknown individual asked Doe, "I heard some members in your company are working in rason[?]"  Rason is a city located in the northeast part of North Korea.  Doe responded, "yes."

Finally, internet history for Doe's Gmail account reflects that the account was used to access multiple websites associated with North Korea between approximately February 2023 and July 2023, including the website for Air Koryo, which is the state-owned airline headquartered in Pyongyang, North Korea, as well a North Korean news media websites.

Mr. Vong has denied knowing that Doe was North Korean.  But the evidence shows he knew Doe was located in Shenyang, China, near the border of North Korea.  In fact, in a Skype chat with Doe on November 28, 2020, when Doe mentioned that he lived in Shenyang, China, Mr. Vong responded, "Damn . . .  North Korean alliance."  He added, "Next to north korea." Doe did not respond to these messages.  Nonetheless, based on these messages, we believe Mr. Vong was at least cognizant of the possibility that Doe had a connection to North Korea.

### ADVISORY SENTENCING GUIDELINES

The parties agree with U.S. Probation's calculation of Mr. Vong's advisory sentencing guidelines.  The base offense level is 7 pursuant to U.S.S.G. § 2X1.1(a), 2B1.1(a)(1) because Mr. Vong was convicted of wire fraud conspiracy in violation of 18 U.S.C. § 1349, and the offense of conviction has a statutory maximum term of imprisonment of 20 years or more.  ECF 44 (PSR), at ¶ 24.

There is a 2-level upward adjustment under U.S.S.G. § 2B1.1(b)(2)(A)(i) because the offense involved 10 or more victims.  *Id.*

There is a 2-level upward adjustment under U.S.S.G. § 2B1.1(b)(10)(B) because a substantial part of the fraudulent scheme was committed from outside the United States.  *Id.*

The parties agree *not* to apply a 14-level upward adjustment under U.S.S.G. § 2B1.1(b)(1)(H) and Application Note 3(B), although the offense involved a loss that cannot reasonably be determined, and the offense involved a gain to the conspirators of more than $550,000.  *Id.*   Instead, the parties agree that an equivalent 14-level upward adjustment is warranted pursuant to U.S.S.G. § 2B1.1 Application Note 21(A)(ii), because the offense caused or risked substantial non-monetary harm, namely, harm to the national security of the United States.  *Id.* ¶ 32.  The parties believe this upward departure more appropriately reflects the greatest harms

in this case, which were generating revenue supporting North Korea's weapons programs and enabling foreign malign actors to access sensitive U.S. government systems, which go beyond mere pecuniary loss.

There is a 3-level reduction under U.S.S.G. § 3E1.1(a) based on Mr. Vong's acceptance of responsibility.  *Id.* ¶¶ 30, 32.  The resulting offense level is 20.  *Id.* ¶ 32.  Mr. Vong is in criminal history category I.  *Id.* ¶ 35.  The advisory guidelines range based on an offense level 20 and criminal history category I is 33 to 41 months' imprisonment.

### **ANALYSIS OF FACTORS UNDER 18 U.S.C. § 3553**

The nature and circumstances of the offense are serious.  The defendant defrauded at least thirteen U.S. companies and four U.S. government agencies out of close to $1 million.  He knew that his overseas co-conspirators were not authorized to work in the U.S. and that they would not be hired if the employers knew the truth.  He knew that he was transmitting large sums of money to unknown individuals located in China, who may have interests adverse to the United States.  He shipped two employer laptops to Shenyang, China, a city that he knew was near the border of North Korea.  Although he denies knowing that his overseas co-conspirators were working for North Korea, he at least seems to have been aware of a *risk* that they were, given his comment about a "North Korean alliance."  Regardless of the defendant's knowledge of North Korea's involvement in the scheme, the reality is that the proceeds of the scheme, excluding the funds that the defendant pocketed for his role (roughly $200,000), went to individuals overseas in support of North Korea.  And more troublingly still, these individuals were granted access to sensitive government systems.

The defendant has no criminal history, and he has accepted responsibility and demonstrated remorse for his crime.  These factors weigh in favor of a lower sentence.  However, it is important

to note that this conviction did not stem from a single, impulsive act.  The defendant played an integral role in the scheme over a roughly four-year period.  He took daily actions to keep the complex scheme in operation and took steps to hide the fraud from his employers.  Indeed, without his assistance, Mr. Vong's co-conspirators would have been unable to obtain these jobs in the first place.

There is a strong need for general deterrence.  The North Korean IT worker scheme employs thousands of highly skilled IT workers to work remotely for U.S. companies using false identities and generate revenue that is funneled back to North Korea.  North Korea has exploited the COVID-19 pandemic and the advent of 100% remote work positions in the U.S., which have increased the number of U.S. jobs accessible to this and similar threat groups.  Additionally, changes to hiring practices and to employment eligibility verification rules have made it easier for North Korean IT workers to obtain employment at the largest and smallest U.S. companies.  A 2024 U.N. Panel of Experts report estimates that the technology sector continues to be a key moneymaker for North Korea, with an estimated 3,000 North Korean IT workers abroad and another 1,000 more operating inside North Korea, generating $250-600 million annually, most of which is returned to the regime.[3]

This scheme, and others like it, would not be successful without U.S.-based facilitators like the defendant, who willingly operated a laptop farm for overseas individuals, defrauded U.S. companies and government agencies, and pocketed a substantial sum of money for his role.  A sentence that is too lenient would convey the wrong message to both North Korean IT workers

---

[3] U.N. Security Council, Final Report of the Panel of Experts submitted pursuant to Resolution 2680 (2023), U.N. Doc. S/2024/215, at 50–51 (Mar. 7, 2024), https://www.securitycouncilreport.org/atf/cf/%7B65BFCF9B-6D27-4E9C-8CD3-CF6E4FF96FF9%7D/S%202024%20215.pdf.

and current and future U.S.-based facilitators that this conduct is tolerated in the U.S. and worth the risk of being caught by U.S. law enforcement.

To the government's knowledge, there has been only one other case involving a North Korea IT worker scheme that has proceeded to sentencing thus far—the case of *United States v. Christina Chapman*, D.D.C. Crim. No. 24-220.  In that case, the U.S.-based facilitator was sentenced to 102 months in prison.  *See* Ex. 1 (*Chapman* Sentencing Transcript).  It is not a perfect comparison because Chapman facilitated fraud against a larger number of employers and generated a larger sum of money that was funneled to the North Korean regime.  Moreover, unlike this case, Chapman's case also involved aggravated identity theft, bank fraud, money laundering, and obstruction of justice.  We seek a far lower sentence of 30 months in this case based on the specific facts and circumstances of Mr. Vong's conduct.  Nonetheless, we believe much of the *Chapman* court's reasoning is applicable here.  As the court there explained:

> Ms. Chapman knew what she was doing was wrong.  She knew that she was assisting some enemy of the United States.  It is not clear which enemy she thought, but she knew it was an enemy of the United States.  She may have unwittingly gotten involved at first, but she—as she continued through this process she knew what she was doing was unlawful.  And … the consequences of what she did are extremely serious.  They were real live victims whose lives were affected by her conduct, companies who were affected by her conduct.  And most significantly from my perspective, the North Korean government was benefitted by her conduct in a manner that was material.  And whether she knew it was North Korea or not or thought it was China or Pakistan, she thought she was helping some enemy of the United States.  And I do think that the national security consequences of this case and cases like it are extremely, extremely serious.

Ex. 1, at 32–33.  Although the court found that Ms. Chapman was "genuinely remorseful" and "the likelihood of recidivism [was] extremely low," the court nevertheless imposed a substantial sentence, saying: "courts are going to take this really, really seriously because the consequences to the safety of our nation are at issue here."  *Id.* at 34.

Here, too, we believe the seriousness of the conduct and the threat to the national security posed by schemes such as this one counsel in favor of a substantial prison sentence. We respectfully submit that a careful weighing of the § 3553 factors calls for a sentence of 30 months in prison, followed by 3 years of supervised release.

## **CONCLUSION**

Based on the foregoing, the Government respectfully recommends that the Court sentence Mr. Vong to 30 months in the Bureau of Prisons, followed by 3 years of supervised release.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

By:_____/s/_____
Christina A. Hoffman
Assistant United States Attorney
36 South Charles Street
Fourth Floor
Baltimore, Maryland 21201
(410) 209-4800

Ex. H



**PRESS RELEASE**

# Maryland Man Sentenced for Conspiracy to Commit Wire Fraud

Thursday, December 4, 2025

**For Immediate Release**

Office of Public Affairs

Minh Phuong Ngoc Vong, 40, of Bowie, Maryland, was sentenced today to 15 months in prison followed by three years of supervised release for his role in a fraudulent scheme that assisted foreign information technology (IT) workers posing as U.S. citizens with obtaining remote IT positions at over a dozen U.S. companies.

According to court documents, Vong conspired with others, including John Doe, aka William James, a foreign national living in Shenyang, China, to defraud U.S. companies into hiring Vong as a remote software developer. After securing these jobs through materially false statements about his education, training, and experience, Vong allowed Doe and others to use his computer access credentials to perform the remote software development work and receive payment for that work. According to court documents, Vong knew that Doe was located next to North Korea. Additionally, Doe's communications indicate that he is likely a North Korean national who was working to generate revenue for the North Korean government.

According to the plea agreement, on Jan. 30, 2023, Doe submitted a fraudulent resume in Vong's name to a Virginia-based technology company for a web application developer position that required U.S. citizenship as a condition of employment. The resume falsely represented that Vong possessed a Bachelor of Science degree and 16 years of experience as a software developer. In fact, Vong did not have a college degree or experience in software development.

On March 28, 2023, Vong participated in an online job interview with the CEO of a Virginia-based company. Vong verified his identity and citizenship by showing his Maryland driver's license and U.S. Passport. Following the interview, the Virginia-based company hired Vong and assigned him to work on a contract for the Federal Aviation Administration (FAA) involving a particular software application used by various U.S. government agencies to manage sensitive information regarding national defense matters. The Virginia-based company provided Vong with a laptop to use in connection with his employment and the FAA authorized Vong to receive a Personal Identity Verification card to access government facilities and systems. Vong installed remote access software on the laptop to facilitate Doe's access to it and conceal his location in China.

Between March 2023 and July 2023, Doe used Vong's credentials to perform the software development work from his location in China. The Virginia-based company paid Vong more than $28,000 in wages for work he performed, portions of which Vong then sent overseas to Doe and other conspirators.

As part of his guilty plea, Vong admitted that the Virginia-based company was not the only company he and his co-conspirators defrauded. Between 2021 and 2024, Vong used fraudulent misrepresentations to obtain employment with at least 13 different U.S. companies, who collectively paid Vong more than $970,000 in salary for software development services that were, unbeknownst to them, performed by Doe or other overseas conspirators. Several of these defrauded companies contracted out Vong's services to U.S. government agencies in addition to the FAA. As a result of Vong's fraudulent misrepresentations, these government agencies unknowingly granted Vong's co-conspirators access to sensitive U.S. government systems, which they accessed from China.

The FBI Baltimore Field Office investigated the case.

Assistant U.S. Attorney Christina A. Hoffman for the District of Maryland prosecuted the case with valuable assistance from the National Security Division's National Security Cyber Section.

Under the Department-wide DPRK RevGen: Domestic Enabler Initiative, launched in March 2024 by the National Security Division and the FBI's Cyber and Counterintelligence Divisions, Department prosecutors and agents are prioritizing the identification and shuttering of U.S.-based "laptop farms" – locations hosting laptops provided by victim U.S. companies to individuals they believed were legitimate U.S.-based freelance IT workers – and the investigation and prosecution of individuals hosting them. The Department previously announced other actions pursuant to the initiative, including in January and June 2025.

*Updated December 4, 2025*